**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| L.N., *et al.*,<br><br>     Plaintiffs,<br><br>  v.<br><br>DISTRICT OF COLUMBIA,<br><br>     Defendant. | Case No. 24-cv-109-TSC-MJS |

## REPORT AND RECOMMENDATION

This case requires the Court to determine whether the District of Columbia Public Schools ("DCPS" or the "District") met its statutory obligations to minor student L.N. under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400, *et seq.* Specifically, Plaintiffs—L.N.'s parents—challenge the appropriateness of two successive individualized education programs ("IEPs") that DCPS proposed for their daughter in February 2022 and June 2023, respectively. Plaintiffs and the District have filed dueling motions for summary judgment, which are before the undersigned by virtue of a referral for full case management. The Court has carefully considered the parties' arguments, the full administrative record, and the controlling authorities and caselaw. Because the Hearing Officer appropriately concluded that the two challenged IEPs were reasonably calculated to enable L.N. to make appropriate educational progress, and because the Hearing Officer reasonably found that Plaintiffs were not substantively harmed by the District's procedural violation in belatedly providing them with a final version of the June 2023 IEP, the undersigned **RECOMMENDS** that the Court **DENY** Plaintiffs' motion for summary judgment (ECF No. 8) and **GRANT** the District's motion (ECF No. 10).

## STATUTORY FRAMEWORK

Congress enacted the IDEA to help ensure all children with disabilities receive a "free appropriate public education" or "FAPE." *See* 20 U.S.C. § 1400(d)(1)(A). This mandate "requires an educational program reasonably calculated to enable a child to make progress in light of the child's circumstances." *Endrew F. v. Douglas Cnty. Sch. Dist.*, 580 U.S. 386, 403 (2017).

The "IEP"—or "individualized education program"—is "the centerpiece of the statute's education delivery system[.]" *Id.* at 391. An IEP is a "comprehensive plan prepared by a child's 'IEP Team'" that serves as "the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 181 (1982)).[1] The statute "requires that school districts have an IEP in place for each student with a disability 'at the beginning of each school year.'" *Leggett v. Dist. of Columbia*, 793 F.3d 59, 63 (D.C. Cir. 2015) (quoting 20 U.S.C. § 1414(d)(2)(A)). An IEP must include "a statement of the child's present levels of academic achievement and functional performance," a list of "measurable annual … academic and functional goals," and "a description of how the child's progress toward meeting the annual goals … will be measured." 20 U.S.C. § 1414(d)(1)(A)(i). It must also identify the "special education and related services … that will be provided" to help the child "advance appropriately toward attaining the annual goals." *Id.* At least annually, the IEP Team must review and revise a child's IEP "as appropriate." *Id.* § 1414(d)(4).

Broadly speaking, the IDEA requires that "'to the maximum extent appropriate,' public schools provide students with disabilities an education in the 'least restrictive environment' possible." *Z.B. v. Dist. of Columbia*, 888 F.3d 515, 528 (D.C. Cir. 2018) (quoting 20 U.S.C. §

---

[1] The composition of an "IEP Team" is prescribed by statute, 20 U.S.C. § 1414(d)(1)(B), and generally "includes teachers, school officials, and the child's parents," *Endrew F.*, 580 U.S. at 391.

1412(a)(5)(A)). This generally means that the "removal of children from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* (citation and quotation marks omitted). More simply put, "the IDEA requires that children with disabilities receive education in the regular classroom whenever possible." *Endrew F.*, 580 U.S. at 400 (citation and quotation marks omitted); *id.* at 401 ("[F]or most children, a FAPE will involve integration in the regular classroom[.]"); *Z.B.*, 888 F.3d at 528 (similar).

Two key principles guide any judicial review of an IEP. First, a court must focus on "whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 580 U.S. at 399 (emphasis in original). After all, "Congress has not committed to educational perfection." *Z.B.*, 888 F.3d at 528; *see also Leggett v. Dist. of Columbia*, 793 F.3d 59, 70 (D.C. Cir. 2015) ("[A] public school district need not guarantee the best possible education or even a potential-maximizing one.") (citation and quotations marks omitted). Second, the court must assess an IEP's "substantive adequacy" based on information available at "the time each IEP was created rather than with the benefit of hindsight." *Edward M.R. v. Dist. of Columbia*, 128 F.4th 290, 294 (D.C. Cir. 2025) (quoting *Z.B.*, 888 F.3d at 524). Putting these principles together, then, "[t]he key inquiry regarding an IEP's substantive adequacy is whether, taking account of what the school knew or reasonably should have known of a student's needs at the time, the IEP it offered was reasonably calculated to ensure the specific student's progress." *Z.B.*, 888 F.3d at 524.

**RELEVANT FACTUAL BACKGROUND**

L.N. is a student diagnosed with Attention Deficit/Hyperactivity Disorder ("ADHD"), a language disorder, and specific learning disabilities ("SLD"), with impairments in reading, written expression, and mathematics. (ECF No. 6, Administrative Record ("AR") at 7, 9, 105.)

For many years, L.N. attended D.C. public schools, including Hearst Elementary School ("Hearst") and Alice Deal Middle School ("Deal"). (AR at 780, 785–86.) Starting in eighth grade, though, L.N.'s parents chose to enroll her at the Lab School of Washington ("Lab"), a full-time private school in Washington, D.C. focused on children with learning disabilities. (*Id.* at 203.)

The claims here center on two IEPs for L.N. proposed by the District in February 2022 and June 2023, so the Court's background discussion adopts a similar focus.

**I.    The February 2021 IEP**

Plaintiffs did not—and do not—contest the sufficiency of the February 2021 IEP. But because Plaintiffs' arguments about L.N.'s later IEP(s) implicate some points of comparison to the February 2021 IEP, a brief overview of that program and the related history is helpful.

L.N. transitioned to Deal for sixth grade in the fall of 2020, after completing her elementary-school years at Hearst. (AR at 785–86.) Because of the ongoing COVID-19 pandemic, the entire 2020–21 school year was virtual. (*Id.* at 786.) In February 2021, an IEP Team met to review and revise L.N.'s IEP, as necessary. L.N.'s parents participated, along with several of her teachers and other DCPS representatives. (*Id.* at 66.) The resulting IEP prescribed eight hours per week of specialized instruction inside general education (*i.e.*, "push-in" support)—split between two hours for reading, two hours for written expression, and four hours for math—plus two hours per month of behavioral support services. (*Id.* at 66–78.) The IEP also included a range of classroom aids and services, including small group instruction, adjustment of assignments,

extended time, visual aids and supports, graphic organizers, scaffolded prompts, chunked assignments, proximity to the teacher, checklists for task completion, and more. (*Id.*)

With the benefit of this IEP, L.N. had a strong sixth-grade year. She progressed on her various IEP goals (*see* AR at 43–62, 81–90), and she finished the year with high marks: A- grades in math, world geography, physical education, and art; B+ grades in language arts, science, and music; and a B- in Spanish. (*Id.* at 91–92.) Moreover, a reading assessment from the latter part of the year showed that L.N. was reading at an eighth-grade level—two grades ahead. (*Id.* at 93.)[2]

Over the summer, in July 2021, independent professionals administered a psychological and educational evaluation of L.N. at Plaintiffs' request. The results of the evaluation indicated that L.N.'s cognitive abilities fell in the "average" range, and she performed well on several tests designed to measure executive functioning. (AR at 97, 100–01, 105.) L.N. also scored in the "average" range on several academic assessments that tested reading, math, and written language. (*Id.* at 104–05.) On the other hand, L.N. did exhibit weaknesses in reading comprehension and math, and the evaluators diagnosed her with "a disorder of mathematics with impairment in math reasoning, calculations, and fluency," and "a disorder of reading with impairment in reading comprehension." (*Id.*) The evaluators offered several recommendations, including "tutoring" in math, reading comprehension, and written language skills. (*Id.* at 106–07.)

## II.    The February 2022 IEP

L.N. continued at Deal for seventh grade, which brought the return of in-person instruction. (AR at 790.) In February 2022, an IEP Team met again to review and revise L.N.'s IEP, as

---

[2] The Hearing Officer's findings of fact reflect that L.N.'s grandparents sent a glowing note to Deal's Assistant Principal at the end of sixth grade, thanking everyone for providing L.N. "with an outstanding opportunity to grow emotionally, within the academics, as a middle schooler," with "a special shout out to Ms. Tierra Peteet [L.N.'s special education teacher]," who they called "brilliant in her approach to providing emotional support" such that "[L.N.] has truly benefited from her work." (AR at 8, 202.)

necessary. L.N.'s parents participated in the meeting, along with several of L.N.'s teachers and other DCPS representatives. (*Id.* at 138.) Based on the data considered—including a variety of assessments and testing, teacher input, classroom observations, and classwork—the resulting IEP identified areas of concern in mathematics, reading, written expression, and emotional, social, and behavioral development. The IEP carried forward the same levels of specialized instruction—eight hours per week of push-in support in the areas of reading (two hours), written expression (two hours), and math (four hours)—plus two hours per month of behavioral support services. The IEP also maintained the same classroom aids and services. (*Id.* at 138–56.) Further, L.N.'s specific goals largely repeated from the February 2021 IEP. (*Compare id.* at 69–70, 72–73, *with id.* at 141, 143, 145–47.) Nothing in the record shows that Plaintiffs raised any concerns during the meeting about the proposed special instruction hours, goals, or anything else about the IEP.

Once again, with the benefit of her IEP(s), L.N. had a reasonably strong year in seventh grade at Deal. She made progress on most of her academic-based IEP goals, even though progress on her emotional, social, and behavioral goals became somewhat stagnant during the latter part of the year. (AR at 176–80.) And while L.N. did not finish with marks quite as high as the year before, she still earned good grades overall: A's in physical education and music, B+'s in science and math, B's in English, world history, and geography, and a C in Spanish. (*Id.* at 205–06.)

## III.    Plaintiffs' Decision To Enroll L.N. At The Lab School & The June 2023 IEP

Not long after the February 2022 IEP meeting, L.N.'s parents applied to—and L.N. was accepted at—the Lab School. The record shows Plaintiffs decided as early as April 2022 that they would send L.N. to Lab for the following school year (eighth grade). (AR at 812, 839.)

L.N. underwent several assessments that following summer. In July 2022, Lab administered a comprehensive speech-language assessment that identified several weaknesses for

L.N., including difficulty in using age-appropriate vocabulary, remembering sentence-level information, following multi-step instructions, and more. (AR at 182–201.) The evaluators diagnosed L.N. with a Language Disorder and a Specific Learning Disorder with impairment in reading and written expression and recommended weekly speech-language therapy. (*Id.* at 192.) Then, the next month, in August 2022, Plaintiffs engaged Amy Mounce, an educational consultant, to complete an academic assessment of L.N. (*Id.* at 213–16, 593–94.) Ms. Mounce's results showed that L.N. scored in the "average" to "low average" range across virtually all the two dozen or so clusters that she tested, except that L.N. scored in the "low" range for mathematics and academic applications clusters and in the "very low" range for applied problems. (*Id.* at 214.)

L.N. began eighth grade at Lab in the fall of 2022. Her parents reported an improvement in L.N.'s social and emotional functioning at Lab. (AR at 812, 828–29.) According to her parents, she did homework more independently and was happy to go to school. (*Id.*)

In February 2023, as L.N.'s prior IEP was near to expiring, DCPS contacted Plaintiffs to schedule an annual IEP review meeting. (AR at 228.) DCPS and Plaintiffs (through their lawyers) went back and forth for some time to find a workable date. As Plaintiffs point out, the record reflects that DCPS could have been considerably more diligent and responsive in that effort, but an IEP meeting was ultimately scheduled for June 2023. DCPS provided Plaintiffs with a draft IEP in advance, which their educational consultant, Ms. Mounce, reviewed and commented on. (*Id.* at 323–43, 347.) In response, DCPS made a variety of modifications to the IEP to address many of Ms. Mounce's comments. (*Compare id.* at 323–42, *with id.* at 349–70.) Plaintiffs attended the IEP meeting, along with their legal counsel and Ms. Mounce, and various DCPS representatives attended, including L.N.'s seventh-grade social worker. In preparing the IEP, the group relied on Ms. Mounce's August 2022 assessment, as well as several other assessments and data from the fall

of 2022 and spring of 2023. (*See id.* at 349–70.) During the meeting, Plaintiffs raised concerns about L.N.'s July 2022 speech language assessment, and they argued that L.N. needed a full-time special education services placement throughout her entire day, like at Lab. (*Id.* at 343–45.)

The resulting IEP prescribed a 25% increase in specialized instruction hours, up from eight to ten total hours per week—and split across reading (two hours), written expression (two hours), mathematics (four hours), and general specialized instruction (two hours).[3] (AR at 362.) The IEP further maintained two hours per month of behavioral support services, along with the same classroom aids and services as the prior IEP. (*Id.*)

Plaintiffs did not receive a finalized copy of the IEP at any point during the summer of 2023. (AR at 823.) By letter dated August 3, 2023, Plaintiffs—through legal counsel—advised DCPS that they planned to keep L.N.'s enrolled at Lab for the upcoming ninth-grade year and requested tuition reimbursement from DCPS. (*Id.* at 387.) About a week later, the District denied that request in writing, taking the position that DCPS made a FAPE available to L.N. with an appropriate IEP and a placement at Jackson-Reed High School. (*Id.* at 388.) In their written response back a few days later, Plaintiffs' counsel did not request a copy of the final IEP. Neither did Plaintiffs (or their lawyers) do so at any point before the 2023–24 school year. (*Id.* at 389.)

## PROCEDURAL HISTORY

Plaintiffs filed their administrative due process complaint on May 19, 2023—prior to the June 2023 IEP meeting—alleging that DCPS denied L.N. a FAPE by: (1) "failing to provide her with an appropriate educational program and placement for the 2022–2023 school year, including

---

[3] The original draft IEP reviewed by Plaintiffs offered thirteen hours per week of specialized instruction, split across reading (two hours), written expression (two hours), mathematics (four hours), and general specialized instruction (five hours). (AR at 334.) Thus, the finalized IEP reduced the last category from five to two hours (*id.* at 362), but this was still an increase from the prior IEP (*id.* at 148).

that her IEP did not provide a sufficient amount of self-contained specialized education services
and that … Deal Middle School was too large of a setting for her"; and (2) "failing to convene an
annual IEP meeting, and provide any educational program or offer of placement and/or location of
services for the 2023–2024 school year when the IEP expired on February 6, 2023." (AR at 277.)
As relief, Plaintiffs sought reimbursement for the cost of the Lab School for the 2022–23 school
year, plus prospective placement and funding at Lab for the 2023–24 school year. (*Id.*)

Leading up to the administrative hearing, counsel for DCPS reportedly discovered that the
final version of the June 2023 IEP was never sent to Plaintiffs after the IEP meeting. DCPS
provided it to Plaintiffs' counsel in a supplemental disclosure, about a week ahead of the hearing.
(AR at 5–6, 578–86.) The Hearing Officer decided, "[i]n the interest of resolving all issues related
to the 2023–24 school year expeditiously," and because Plaintiffs and their counsel were familiar
with the proposed IEP given their participation in the June 2023 IEP meeting where it was crafted,
to accept the June 2023 IEP into evidence and allow Plaintiffs to pursue additional claims based
on the IEP. (*Id.* at 5–6.) Specifically, as to the June 2023 IEP, the Hearing Officer identified the
issues for resolution to include claims that the IEP: "(a) was not provided to Petitioners until
September 25, 2023, (b) did not provide a sufficient amount of self-contained special education
services or a [location of services], and (c) did not include [speech-language] services." (*Id.* at 6.)

The Hearing Officer conducted the administrative hearing over the course of four days,
from October 2–5, 2023. Seven witnesses testified on behalf of DCPS, including L.N.'s sixth-
grade special education teacher at Deal (Tierra Peteet), L.N.'s social worker at Deal (Hilary Katz),
the special education coordinator at Deal (Charlie Chapman), DCPS's non-public monitor (Sean
Bradley), two assistant principals at Deal (Adam Kirschenbaum and Stacey Gathers), and a speech-
language pathology expert (Alyssa Elliot). Four witnesses testified for Plaintiffs, including one of

L.N.'s parents, their educational consultant (Amy Mounce), Lab's clinical director of speech-language (Gretchen Kunz), and Lab's director of jurisdictional services (Audrey Dolginoff).

The Hearing Officer issued his decision promptly after the hearing, on October 16, 2025. (AR at 4–29.) Through a dozen pages of detailed factual findings, the Hearing Officer synthesized his interpretation of the evidence and witness testimony. (*Id.* at 7–19.) From there, the Hearing Officer went on to conclude that DCPS met its burden to show that both the February 2022 IEP and the June 2023 IEP were reasonably calculated to enable L.N. to make appropriate educational progress based on her circumstances. And although the Hearing Officer found that DCPS's failure to timely provide Plaintiffs with the final version of the June 2023 IEP was a procedural violation of the IDEA, he determined Plaintiffs were not substantively harmed as a result. Accordingly, the Hearing Officer dismissed Plaintiffs' administrative complaint in full. (*Id.* at 19–26.)

Plaintiffs timely sought review in this Court. (*See* ECF No. 1, Complaint.) After lodging the administrative record, the parties filed dueling motions for summary judgment, which are ripe for decision. (ECF Nos. 8 ("Pls.' Mem."); ECF No. 12 ("Defs.' Mem.").) This ruling follows.

## LEGAL STANDARDS

Although motions seeking review of a hearing officer's decision under the IDEA are often framed as motions for summary judgment, the Court does not follow "a true summary judgment procedure" in this context. *Middleton v. Dist. of Columbia*, 312 F. Supp. 3d 113, 128 (D.D.C. 2018) (quoting *L.R.L. v. Dist. of Columbia*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012)). Rather, "[a] motion for summary judgment operates as a motion for judgment based on the evidence comprising the record and any additional evidence the court may receive." *D.R. v. Dist. of Columbia*, 637 F. Supp. 2d 11, 16 (D.D.C. 2009). Put another way, the motion for summary judgment is "the procedural

vehicle for asking the judge to decide the case on the basis of the administrative record." *M.G. v. Dist. of Columbia*, 246 F. Supp. 3d 1, 8 (D.D.C. 2017) (citation omitted).

On judicial review under the IDEA, courts "shall grant such relief as [they] determine[] is appropriate," based upon "a preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C); *see also Rowley*, 458 U.S. at 205–06. In doing so, courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Rather, courts "must give due weight to the administrative proceedings and afford some deference to the expertise of the [independent hearing officer] and school officials responsible for the child's education." *Gill v. Dist. of Columbia*, 751 F. Supp. 2d 104, 109 (D.D.C. 2010) (citation and quotation marks omitted). In general, "a hearing officer's findings based on credibility determinations of live witness testimony are given particular deference where there is no supplementation of the record." *McAllister v. Dist. of Columbia*, 45 F. Supp. 3d 72, 76 (D.D.C. 2014) (citation and quotation marks omitted). But "a hearing decision 'without reasoned and specific findings deserves little deference.'" *Reid v. Dist. of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting *Kerkam v. Superintendent, D.C. Pub. Schs.*, 931 F.2d 84, 87 (D.C. Cir. 1991)).

## ANALYSIS

As previewed, Plaintiffs take aim at two IEPs: the February 2022 and June 2023 IEPs. The Court addresses each IEP and Plaintiffs' related claims in turn.

## I.    The February 2022 IEP

Plaintiffs' challenge to the February 2022 IEP hinges on two separate but somewhat interrelated arguments, namely that: (1) DCPS did not prescribe enough special education service hours in the IEP, and (2) the placement and class-size at Deal was too large for L.N.'s needs.

A.        **Plaintiffs' Substantive Objections**

As to Plaintiffs' first argument, the February 2022 IEP prescribed eight hours of weekly push-in specialized instruction for L.N., carrying forward the same measure of services from the prior IEP. (*Compare* AR at 148 (February 2022 IEP), *with id.* at 75 (February 2021 IEP).) Plaintiffs contend that considerably more was required; they say L.N. required full-time special education outside the general education environment. (*Id.* at 15–16, 610.) The Hearing Officer, through a detailed review and discussion of the record evidence, sided with DCPS and rejected Plaintiffs' position, concluding that the February 2022 IEP "was reasonably calculated to enable [L.N.] to make progress appropriate in light of [her] circumstances." (*Id.* at 19–23.) On review, this determination was reasonable and reasonably supported, and Plaintiffs have failed to convince the Court "that the hearing officer was wrong[.]" *Reid*, 401 F.3d at 521; *W.S. v. Dist. of Columbia*, 502 F. Supp. 3d 102, 119 (D.D.C. 2020) ("The party challenging the hearing officer's decision takes on the burden of persuading the court that the hearing officer was wrong.") (cleaned up).

Start with L.N.'s educational history. The Hearing Officer rightly considered L.N.'s past progress under prior IEPs. *See, e.g.*, *K.S. v. Dist. of Columbia*, 962 F. Supp. 2d 216, 221 (D.D.C. 2013) ("Academic progress under a prior plan may be relevant in determining the appropriateness of a challenged IEP."). Throughout her time with DCPS, L.N. had been consistently taught in a general education environment with push-in support, and L.N. progressed appropriately from year to year. The preceding IEP from February 2021, in fact, prescribed the same measure of specialized instruction—eight hours per week in general education, split the same way—and L.N. made strong academic headway in her sixth-grade year under the IEP. She progressed on her IEP goals, she earned high grades, and she was even assessed as reading at an eighth-grade level. This is not to say L.N. did not have some relative weaknesses in certain areas—and the Hearing Officer

12

appropriately recognized as much—but those relative weaknesses are what DCPS aimed to target through the calibrated level of specialized instruction hours that it offered in the IEP.

More, the Hearing Officer discussed the academic assessments and other testing available to the IEP Team at the time they crafted the plan, finding they reflected that L.N.'s "performance was consistent with [her] cognitive abilities." (AR at 21.) L.N. largely scored in the "average" range across most categories, with a handful of "high average" or "low average" scores. (*Id.*) In other words, the Hearing Officer concluded those assessments aligned with the District's approach of continuing to deliver specialized instruction to L.N. through a moderate amount of weekly push-in support hours across a few targeted areas of concern.

Still more, the Hearing Officer credited the testimony of DCPS's witnesses who opined that L.N. "successfully access[ed] grade level content" under the same framework in prior IEPs and made "educational gains during the school year in a general education environment." (AR at 17–18.) DCPS's witnesses testified that "the data did not support the need for [L.N.] to be in a private school environment, segregated from non-disabled peers, to make progress." (*Id.* at 17; *id.* at 18 (similar, describing testimony that "no data exists that suggests [L.N.] requires a self-contained segregated placement, apart from non-disabled peers, to make progress").) By contrast, the Hearing Officer found that the competing proposition proffered by Plaintiffs and their witnesses—*i.e.*, that L.N. "require[d] a full-time special education placement in a private school"—was "belied by the record" and thus not credible. (*Id.* at 21.) An intensive, full-time placement, the Hearing Officer reasoned, was at odds with L.N.'s past performance and the testing data, among other things. (*Id.* at 22 (discounting Ms. Mounce's testimony that L.N. "requires special education services outside general education throughout the school day" because, among other reasons, "there is no dispute that [L.N.] made progress in a general education environment

from the 2015–16 school year through the 2020–21 school year”).) Plus, as the Hearing Officer made a point to highlight, one of Plaintiffs' witnesses, Ms. Dolgnioff from the Lab School, "conceded" she "never before recommended that a child with a profile similar to [L.N.] required specialized instruction throughout the school day in a private school." (*Id.* at 22.)

Turning to Plaintiffs' second argument focused on placement and class-size, it is essentially just an outgrowth of the first. Plaintiffs say that L.N. required a smaller class size in a more restrictive environment because she supposedly "could not make progress in a larger class." (AR at 22.) But the Hearing Officer again pointed back to L.N.'s "consistent record of academic progress … in large … general education classes," as evidenced by her "grades, progress reports," and "periodic assessments" in that setting. (*Id.*) The record showed that L.N. "made consistent progress in a general education environment" at Deal, in classes of between 20–22 students. (*See id.*) So, on this point, too, the Hearing Officer found DCPS's approach of using push-in support in a general education classroom was reasonably calculated to enable L.N. to make progress and rejected Plaintiffs' argument for a smaller and more restrictive environment.

These conclusions are both bolstered by the IDEA's imperative that "children with disabilities received education in the regular classroom whenever possible." *Endrew F.*, 580 U.S. at 400; *Z.B.*, 888 F.3d at 528 (similar); *see also* 20 U.S.C. § 1412(a)(5)(A). In this way, the IEP's measured amount of specialized instruction support within general education—especially given L.N.'s demonstrated track record of progress under that framework in years past—was far more in keeping with the IDEA's least-restrictive-environment mandate than Plaintiffs' preference, which would have placed L.N. entirely outside the general education environment in a setting the IDEA strives to avoid "to the maximum extent appropriate[.]" *Z.B.*, 888 F.3d at 528.

For these reasons, on the question of whether the February 2022 IEP offered an appropriate level of specialized instruction in an appropriately sized environment for L.N.'s circumstances, the Court easily concludes that the Hearing Officer "reached reasonable conclusions based on the totality of the record before him, including the testimony of both parties' witnesses." *A.D. v. Dist. of Columbia*, 2022 WL 683570, at *11 (D.D.C. Mar. 8, 2022) (citing *S.M. v. Dist. of Columbia*, 2020 WL 7230266, at *5 (D.D.C. Dec. 8, 2020)). Put another way, the Hearing Officer issued "a well-reasoned administrative decision that is supported by the evidence in the administrative record. Nothing more is required to sustain that decision." *Edward M.R. v. Dist. of Columbia*, 660 F. Supp. 3d 82, 116 (D.D.C. 2023), *aff'd*, 128 F.4th 290 (D.C. Cir. 2025).

## B.    Plaintiffs' Remaining Arguments

Against these conclusions, Plaintiffs attempt to discredit the Hearing Officer's decision through a few different arguments. None prevails.

***First***, Plaintiffs insist the Hearing Officer failed to fully consider that the February 2022 IEP repeated the same academic goals as the February 2021 IEP. They go so far as to complain that the Hearing Officer "simply ignored [L.N.'s] lack of goal achievement." (Pls.' Mem. at 22.) Plaintiffs are wrong. For one thing, their accusation that the Hearing Officer "ignored" the issue is easily refuted by the record; the Hearing Officer's decision addressed the goals directly:

> [T]hat [L.N.] had not mastered any of the goals on the February 16, 2021 IEP does not mean [she] made no progress throughout the year. Petitioners' witnesses … argue that lack of mastery indicated that the following IEP with the same goals was inherently inappropriate. IDEA requires an IEP reasonably calculated to produce progress, not necessarily mastery. [Deal's Assistant Principal] testified that distance learning, which was implemented a month after the IEP was developed and lasted throughout the 2021–22 school year for [L.N.] complicated instruction, leading the IEP team to maintain goals until they were sure goals had been mastered.

(AR at 21–22.) For another thing, there is nothing inherently wrong with repeating goals from one IEP to the next, at least with a reasoned basis for doing so, as the D.C. Circuit just reaffirmed.

*Edward M.R.*, 128 F.4th at 294 ("True, [the student's] 2018 IEP repeated some goals from his 2017 IEP, and his 2019 IEP repeated several goals from his 2018 IEP. But repeating goals was reasonable because Edward had yet to achieve them."). And as the above passage of the Hearing Officer's decision reflects, DCPS witnesses testified that they maintained L.N.'s goals in the February 2022 IEP because she had not fully achieved them, in part due to the "complicating" circumstances associated with full-time virtual learning during the prior school year. (AR at 21–22; *see also id.* at 17 (summarizing Mr. Kirschenbaum's testimony that "the goals would not be changed unless the IEP team was sure that they were mastered"); *id.* at 17 (summarizing Ms. Peteet's testimony that "there was no disagreement that [L.N.'s] goals would be repeated on the February 7, 2022 IEP").). On this record, then, the fact that the February 2022 IEP carried forward the same goals as the February 2021 IEP does not mean the February 2022 IEP was inadequate.[4]

**Second**, Plaintiffs argue that the Hearing Officer wrongly credited the District's witnesses over theirs, declaring that "the lack of knowledge exhibited by DCPS in this matter [was] nothing less than astounding." (Pls.' Mem. at 33; *see id.* at 31–37.) They fare no better on this point.

Plaintiffs start by invoking language from *Endrew F.*, 580 U.S. at 404, where the Supreme Court indicated that a court "may fairly expect [school] authorities to *be able to offer a cogent and responsive explanation* for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of [their] circumstances." (Pls.' Mem. at 32 (emphasis theirs).) Plaintiffs suggest the Hearing Officer failed to uphold that expectation here, even going so far as to complain that "the words 'cogent and responsive' fail to appear" anywhere

---

[4] The Court also observes that L.N.'s reading goal, at least, was tied to "grade level": "After reading a grade level text, [L.N.] will identify two pieces of evidence to support a claim or inference about a text in 2 out of 3 opportunities presented." (*See* AR at 79, 143.) So, even though the written articulation of L.N.'s reading goal stayed the same as between the two IEPs, the substance of the goal evolved because the February 2022 IEP would require L.N. to read "grade level text" appropriate for *seventh* grade, not *sixth* grade.

in the Hearing Officer's decision. (*Id.* at 33.) Taking the last point first, Plaintiffs' criticism rests on a misunderstanding of *Endrew F.*, which did not announce "the phrase 'cogent and responsive' as some sort of talismanic incantation that must appear on the pages of all IDEA decisions." *N.T. v. Dist. of Columbia*, 2025 WL 1895485, at *10 (July 9, 2025) (citing *H.R. v. Dist. of Columbia*, 2024 WL 134444, at *17 (D.D.C. Mar. 29, 2024)). The Court was instead focused on "the substance of the school system's explanation, not certain magic words that must be used to describe it." *Id.* And here, while the Hearing Officer's decision concededly did not utilize the phrase "cogent and responsive," it certainly lays out a cogent, responsive, and reasonable explanation for DCPS's proposed IEPs nevertheless, including for many of the reasons already discussed.

To reiterate, the Hearing Officer summarized L.N.'s prior academic progress, end-of-year grades, testing and assessment results, and more—all of which supported DCPS's decision to maintain a balanced approach to specialized instruction and placement. (AR at 7–12, 21–22.) Further, the Hearing Officer discussed and weighed relevant testimony from DCPS's witnesses. For instance, the decision credited the testimony of L.N.'s special education teacher, Ms. Peteet, who opined that "the level of services was appropriate based on [L.N.'s] progress" and that data "does not exist that supports the need to separate [L.N] completely from non-disabled peers." (AR at 17.) The same was true for Ms. Katz, L.N.'s social worker, who opined that "[f]rom a behavioral standpoint … data did not support the need for [L.N.] to be in a private school environment, segregated from non-disabled peers, to make progress." (*Id.*) And the Hearing Officer likewise credited similar testimony from Ms. Gathers, Deal's Assistant Principal, and Ms. Chapman, Deal's Special Education Coordinator. (*Id.* at 17–18 (describing testimony from Ms. Gathers that "no data exists that suggests [L.N.] requires a self-contained, segregated placement, apart from non-disabled peers, to make progress," and testimony from Ms. Chapman that "the level of services

17

prescribed in the IEP was appropriate, because [L.N.] made educational gains during the school year in a general education environment").) Ultimately, the Hearing Officer concluded that the evidence and testimony put forward by DCPS demonstrated the appropriateness of the IEP it proposed. (AR at 22 ("The record supports the opinions of DCPS' witnesses who testified that [L.N.] made consistent progress in a general education environment at [Deal].").).

In resisting this outcome, Plaintiffs rely heavily on *M.O. v. District of Columbia*, where the court remanded because a hearing officer's decision "lack[ed] sufficiently detailed reasoning" and did "little to address" the plaintiffs' evidence. 20 F. Supp. 3d 31, 40–41 (D.D.C. 2013). This case is nothing like *M.O.* Here, the Hearing Officer amply explained his reasoning in a way that permits meaningful review, as the Court just summarized. And the Hearing Officer did not turn a blind eye to Plaintiffs' evidence. To the contrary, the Hearing Officer discussed the testimony of Plaintiffs' witnesses in meaningful detail (AR at 15–17) and explained why he believed their opinions were largely "belied by the record" and thus not credible (*id.* at 21–22). The Hearing Officer acknowledged Ms. Mounce's opinion, for example, that L.N. "require[d] special education services outside general education throughout the school day," but did not credit that opinion because "there [was] no dispute that [L.N.] made progress in a general education environment from the 2015–16 school year through the 2020–21 school year." (*Id.* at 22.) The Hearing Officer similarly pointed out that neither Ms. Mounce nor Ms. Dolginoff "attempted to discredit the grades, progress reports, or periodic assessments from [Deal]," through which L.N. demonstrated a "consistent record of academic progress … in large … general education classes." (*Id.*)

In short, the Hearing Officer demonstrably engaged with the evidence and testimony presented by both sides. The Hearing Officer's factual findings, especially those based on credibility determinations, are owed "'particular deference.'" *B.B. v. Dist. of Columbia*, 2022 WL

18

834146, at *10 (D.D.C. Mar. 21, 2022) (quoting *McAllister v. Dist. of Columbia*, 45 F. Supp. 3d 72, 76 (D.D.C. 2014)); *see also Fullmore v. Dist. of Columbia*, 2016 WL 1254208, at *1 (D.D.C. Mar. 29, 2016) ("The Court may not substitute its own views for those of the Hearing Officer[.]"); *Garris v. Dist. of Columbia*, 210 F. Supp. 3d 187, 190 (D.D.C. 2016) ("[T]hese objections are about how the Hearing Officer weighed the evidence .... That Plaintiffs draw a different conclusion from that evidence does not make the Hearing Officer's alternative conclusion improper.").

*Third*, Plaintiffs assert that the Hearing Officer mistakenly "failed to consider L.N.'s response to the programming at Lab." (Pls.' Mem. at 22.) If the Hearing Officer had more fully engaged in a comparative analysis of L.N.'s academic performance in DCPS schools against her performance at Lab, Plaintiffs posit, then the Hearing Officer would have—or at least should have—concluded that DCPS's proposed IEPs came up short. This argument fails for two reasons. One, at least as to the February 2022 IEP, there was no track record at Lab for DCPS to even consider at the time that IEP was crafted. L.N. started Lab in the fall of 2022, months after the IEP was prepared. And an IEP's substantive adequacy must be evaluated with information available at the time it was "created rather than with the benefit of hindsight." *Edward M.R.*, 128 F. 4th at 294; *see also Philpot v. Dist. of Columbia*, 2025 WL 1311025, at *4–5 (D.D.C. May 6, 2025) ("[H]indsight evidence is not germane to the sufficiency of an IEP prepared long before the evidence even existed"), *report and recommendation adopted*, 2025 WL 1517245 (D.D.C. May 28, 2025); *Pavelko v. Dist. of Columbia*, 288 F. Supp. 3d 301, 308 (D.D.C. 2018) ("[T]he adequacy of an IEP can be measured only at the time it is formulated, not in hindsight."); *S.S. v. Howard Rd. Acad.*, 585 F. Supp. 2d 56, 66 (D.D.C. 2008) ("Neither the statute nor reason countenance Monday Morning Quarterbacking."). Two, even accepting that L.N. did make progress—perhaps even better progress, as Plaintiffs argue—at Lab, that would not foreclose that L.N. likewise made

appropriate progress with DCPS or that the District's February 2022 IEP was appropriately crafted to enable her to continue to do so. *See N.T. v. Dist. of Columbia*, 839 F. Supp. 2d 29, 35 (D.D.C. 2012) ("The question before the Court is not whether The Lab School could better educate N.T. than a public school but whether N.T. could receive a FAPE at a public school.").[5]

*    *    *

The Court should uphold the Hearing Officer's determination that the IEP proposed by DCPS in February 2022 satisfied the IDEA because it was reasonably crafted to allow L.N. to make meaningful progress based on her circumstances.

## II.    The June 2023 IEP

Plaintiffs' attacks against the June 2023 IEP take a similar approach, focusing substantively on arguing that the IEP failed to: (1) offer a sufficient level of self-contained specialized education; (2) provide an appropriately sized location of services; and (3) include separate speech-language services. Separately, Plaintiffs seek relief based on DCPS's procedural misstep in not providing them a copy of the final June 2023 IEP before the start of the 2023–24 school year.

### A.    Plaintiffs' Substantive Objections

Plaintiffs' first two substantive objections about the June 2023 IEP—the amount of special education hours and the appropriateness of L.N.'s placement in general education instead of a smaller environment—repeat the same complaints they raised about the February 2022 IEP. For

---

[5] Finally, the Court returns to the fact that Plaintiffs did not voice any disagreements with or objections to the February 2022 IEP during its development. While admittedly not dispositive, this fact is "certainly relevant to an inquiry regarding the appropriateness of the IEP." *E.W.-G. v. Dist. of Columbia*, 2023 WL 2598680, at *6 (D.D.C. Mar. 22, 2023); *see also Jalloh v. Dist. of Columbia*, 968 F. Supp. 2d 203, 212 (D.D.C. 2013) (upholding the sufficiency of an IEP because, among other reasons, the parents "failed to raise any substantive concerns about the IEP" when it was developed); *Hinson v. Merritt Educ. Ctr.*, 579 F. Supp. 2d 89, 103 (D.D.C. 2008) (finding the IEP appropriate, in part, because "[p]laintiff participated in the process and agreed to the IEP at the time it was developed"); *Schoenbach v. Dist. of Columbia*, 309 F. Supp. 2d 71, 89 (D.D.C. 2004) ("[P]arents must talk, or complain, when given the chance.").

their part, Plaintiffs once again insist that L.N. "required placement in a full-time special education program." (*See* Pls.' Mem. at 9; *see also* AR at 343 (June 2023 IEP meeting notes reflecting "family's position" that L.N. required "a full-time special education setting throughout her entire day" in a "small support environment").) The Hearing Officer largely determined that the same analysis supporting the sufficiency of the February 2022 IEP applied with relatively equal force to the June 2023 IEP. Plaintiffs fail to convince the Court that this analysis was wrong.

Recall that the June 2023 IEP proposed an increase in L.N.'s special education hours—up from eight hours per week to ten hours per week—to continue as push-in support in a general education classroom. Further, the IEP maintained two hours per month of behavioral support services, along with the same panoply of classroom aids and services. (AR at 362.) The Hearing Officer considered these details against the broader record to conclude as follows:

> In the previous section, I found that the IEP DCPS developed on February 7, 2022 was appropriate to meet [L.N.'s] unique needs…. At the IEP meeting on June 16, 2023, the IEP team was presented with no data from [the Lab School] that [L.N.'s] performance had declined in any of the three areas of concern: math, reading, or written expression. Nevertheless, the IEP team increased [L.N.'s] specialized instruction to ten hours per week inside general education. [L.N.] had documented academic improvement under the February 16, 2021 IEP. The February 7, 2022 IEP was appropriate, in part, because the level of services on the 2021 IEP yielded objective proof of academic progress. Similarly, as DCPS has demonstrated that [L.N.] has been able to make progress with an IEP providing eight hours of push-in support per week, without a showing that [L.N.'s] needs have increased since the development of the 2022 IEP, an IEP that provides two additional hours per week of push-in support to a general education classroom is reasonably calculated to enable [L.N.] to make academic progress. Therefore, I conclude that DCPS has met its burden of proving that it developed an appropriate IEP for [L.N.] on June 16, 2023.

(*Id.* at 26.) The Hearing Officer also explained why he found unpersuasive the testimony from Plaintiffs' witnesses, Ms. Mounce and Ms. Dolginoff, both of whom opined that L.N. required a full-time special education placement. (*Id.* at 23.) Among other points, the Hearing Officer rejected Ms. Mounce's opinion that L.N. was "incapable of making progress in an environment less

restrictive than" the Lab School, finding it "belied by the progress [L.N.] made at [Deal] as documented by [her] grades, progress reports," and various testing and achievement scores. (*Id.*) The Court concludes that these determinations are reasonable and reasonably supported.

Plaintiffs' various counterarguments—discussed above—fare no better as to the June 2023 IEP. On those points, the Court largely incorporates its earlier analysis. But the Court does more fully address Plaintiffs' argument that the Hearing Officer gave short shrift to L.N.'s comparative performance at Lab in assessing the June 2023 IEP. By the time of that IEP meeting, L.N. did have an academic track record at Lab, so Plaintiffs' argument does not implicate hindsight evidence in the same way as was true for the February 2022 IEP. But Plaintiffs still fail to demonstrate why L.N.'s performance at Lab during the 2022–23 school year necessarily means DCPS fell short with its proposed IEP. For one thing, the final June 2023 IEP did consider and discuss L.N.'s academic performance and various testing results from the 2022–23 school year (AR at 351, 354–55, 357–58, 360), so Plaintiffs are wrong again in suggesting that more evidence was "virtually ignored" (Pls.' Mem. at 22). And as noted already, the Hearing Officer found that information relevant insofar as it didn't show that L.N.'s "performance had declined in any of the three areas of concern." (AR at 26.) Plaintiffs advocate a different interpretation of the evidence, essentially arguing that L.N.'s comparative success at Lab shows why that placement was necessary. This argument fails. After all, "the fact that [L.N.] was making progress … in the full-time special-education environment at the Lab School does not mean that the IEP team—and, subsequently, the Hearing Officer—must necessarily conclude that the full-time special education environment at the Lab School is the *only* place where [L.N.] could achieve academic progress for purposes of the IDEA." *N.T.*, 2025 WL 1895485, at *11 (emphasis in original). And here, the Hearing Officer laid

out a cogent rationale for concluding that DCPS's proposal was reasonably likely to allow L.N. to make progress, short of a full-time special education placement at a private school like Lab.

This leaves Plaintiffs' argument that the June 2023 IEP was inadequate because it failed to include speech-language services. In so arguing, Plaintiffs rely heavily on the speech and language evaluation completed by Lab in July 2022, which diagnosed L.N. with a language disorder and recommended weekly speech-language services, along with the testimony of the Director of Speech/Language Services at Lab, Gretchen Kunz. The Hearing Officer considered that evidence against the testimony of DCPS's speech-language expert, Alyssa Elliott. On balance, the Hearing Officer adjudged that Ms. Kunz's opinions were "refuted" by L.N.'s academic history and other data, choosing to credit Ms. Elliott's opinions on this issue instead. (AR at 23–24.)

As the Hearing Officer summarized Ms. Elliott's testimony, she questioned "the validity" of the July 2022 evaluation overall in certain respects but noted, regardless, that "everything related to speech on the evaluation was average." (*Id.* at 24.) She opined that "a student with [L.N.'s] profile, who has never had difficulty communicating in the classroom or the community[,] does not need direct [speech-language] services." (*Id.*) Rather, based on the results of the evaluation, Ms. Elliott said she would recommend "visual accommodations, sentence starters, and use of graphic organizers," which were already included in L.N.'s IEPs. (*Id.* at 18.) In other words, Ms. Elliott took the view that any speech-language deficits were being addressed through other supports in the IEP, without the need for separate, standalone speech-language services.

Simply put, after weighing the evidence and making credibility assessments about each side's experts, the Hearing Officer credited DCPS's expert, Ms. Elliott, over Plaintiffs' expert, Ms. Kunz. Once again, this credibility-driven determination is entitled to due deference. *B.B.*, 2022

WL 834146, at *10; *Garris*, 210 F. Supp. 3d at 190. And particularly against that backdrop of deference, Plaintiffs have failed to demonstrate that the Hearing Officer got it wrong.

*    *    *

The Court should likewise uphold the Hearing Officer's determination that the IEP proposed by DCPS in June 2023 satisfied the IDEA because it was "reasonably calculated to enable [L.N.] to make progress[.]" *Endrew F.*, 580 U.S. at 403.

### B.    Plaintiffs' Delay-Based Claim

Finally, Plaintiffs challenge the June 2023 IEP because DCPS delayed in delivering the finalized IEP to them until after the start of the 2023–24 school year. The Hearing Officer determined this was a "clear procedural violation" but found that it did not result in a FAPE denial because it did not affect L.N.'s substantive rights. (AR at 24–26.) The Court agrees.

For starters, as the Hearing Officer rightly recognized, the IDEA requires that "officials must have an IEP in place for each student with a disability 'at the beginning of each school year.'" *Leggett*, 793 F.3d at 67 (quoting 20 U.S.C. § 1414(d)(2)(A)). Based on that requirement, the Court sees no reason to upset the Hearing Officer's finding that DCPS committed a procedural IDEA violation by failing to provide Plaintiffs with a copy of L.N.'s June 2023 IEP until late September 2023, especially since the District does not offer any real argument to the contrary. But a procedural violation of the IDEA "will constitute a denial of a free appropriate public education only if it 'results in loss of educational opportunity' for the student." *Id.* (quoting *Lesesne v. Dist. of Columbia*, 447 F.3d 828, 834 (D.C. Cir. 2006)) (cleaned up). Put another way, "a school district's failure to comply with the procedural requirements of IDEA will be 'actionable' only 'if those procedural violations affected the student's substantive rights.'" *Id.* (quoting *Lesense*, 447 F.3d at 832, 834); *see* 20 U.S.C. § 1415(f)(3)(E)(ii) (confirming that a

24

procedural violation denies a FAPE "only if the procedural inadequacies … impeded the child's right to a free appropriate public education," "significantly impeded the parents' opportunity to participate in the decisionmaking process," or "caused a deprivation of educational benefits").

Here, the Court agrees with the Hearing Officer's assessment that DCPS's late delivery of the final IEP did not impede or deprive L.N. of educational benefits, significantly impede Plaintiffs' ability to participate in the process, or otherwise affect L.N.'s substantive rights.

To begin, Plaintiffs fully participated in the June 2023 IEP meeting to develop the IEP, with the added support of their legal counsel and educational consultant, Ms. Mounce (who even marked up a draft IEP beforehand). (AR at 349; *id.* at 323–42.) Courts typically "refuse[] to find a serious deprivation of a parent's participation where a parent participated in the relevant meetings, as was the case here." *Barber v. Dist. of Columbia*, 2022 WL 22841025, at *26 (D.D.C. Dec. 9, 2022), *report and recommendation adopted*, 2023 WL 11835281 (D.D.C. Jan. 3, 2023); *J.T. v. Dist. of Columbia*, 496 F. Supp. 3d 190, 203–04 (D.D.C. 2020) (similar) (collecting cases), *aff'd*, 2022 WL 126707 (D.C. Cir. Jan. 11, 2022). So, too, here. Plaintiffs weighed in meaningfully on the contours of L.N.'s IEP both before and during the meeting—including through Ms. Mounce and their lawyers—prompting several revisions and modifications. And ultimately, Plaintiffs knew the key contours of DCPS's overall proposal to educate L.N. in general education with a calibrated schedule of push-in specialized instruction across key areas of concern—a far cry from the "full-time special education setting throughout [the] entire day" that Plaintiffs believed was warranted. (*See* AR at 334 (draft IEP proposing push-in hours); *id.* at 362 (draft IEP proposing push-in hours); *id.* at 343 (IEP meeting notes by Ms. Mounce reflecting the "family's position of [L.N.] needing full-time special education services").)

More, the record shows that DCPS's proposed IEP was not one that Plaintiffs were prepared to accept, whether they received it in February 2023 (immediately upon expiration of the prior IEP), June 2023 (immediately after the meeting), or September 2023 (when it was belatedly provided). The Hearing Officer made a similar point, reasoning that "it [was] clear from the record that [Plaintiffs] would accept no placement short of a private school placement." (AR at 25.) The Court needn't go quite that far, but the record certainly shows that Plaintiffs would not accept the placement contemplated by the District's June 2023 IEP. After all, the June 2023 IEP essentially carried forward the same approach to specialized instruction as the February 2022 IEP (albeit with two added hours per week), which Plaintiffs previously deemed unacceptable because they decided within months, by April 2022, to move L.N. to the Lab School and a full-time special education environment. Thus, the Hearing Officer correctly determined that the late delivery of the IEP did not deny L.N. a FAPE because there was nothing in the record to suggest that its timely delivery would have made any difference. There is certainly no evidence—whether testimony from L.N.'s parents or otherwise—that Plaintiffs would have accepted a placement at Jackson-Reed under the June 2023 IEP if only they had received the final proposal sooner.[6]

---

[6] On this point, the Court finds it hard to ignore the back and forth between Plaintiffs' lawyers and DCPS in August 2023, before the school year began. After Plaintiffs' lawyers wrote DCPS to advise that L.N. would remain at Lab for the upcoming year and to request funding, DCPS promptly responded with a written letter to convey its position that it made a FAPE available to L.N. through an appropriate IEP and a placement at Jackson-Reed. (AR at 387–88.) Surely Plaintiffs' lawyer (and Plaintiffs, for that matter) knew at that time that DCPS had yet to provide them with the finalized IEP. But rather than just requesting it to clear up any confusion, they chose to stay mum. This seems to reflect one of two things. Either Plaintiffs had no intention of seriously pursuing a placement with DCPS under the IEP, or Plaintiffs' counsel was engaged in a bit of gamesmanship to preserve an argument for their upcoming due process hearing, or both. Regardless, any of those takeaways further supports a finding of no substantive harm. Further, the District's letter dispels Plaintiffs' briefing suggestion that they were somehow unsure about the specific school where DCPS proposed to implement the June 2023 IEP. (*See* Pls.' Mem. at 27 (arguing that "no specific school was discussed during the IEP meeting" and that the IEP "could not have been implemented at Deal"). The letter spells out Jackson-Reed clear as day, and Plaintiffs had those details before the school year began.

Finally, Plaintiffs rely heavily on the D.C. Circuit's decision in *Leggett* to argue that DCPS's untimely delivery of the June 2023 IEP supposedly harmed L.N. and denied her a FAPE. In *Leggett*, after DCPS failed to finalize a student's IEP before the school year, and after DCPS ignored repeated outreach by the student's parent, the parent withdrew the student from Woodrow Wilson High School (since renamed Jackson-Reed) to attend a private boarding school in Pennsylvania. 793 F.3d at 64–66. The court determined, on those facts, that the procedural failure caused substantive harm because the parent "expressly left open the possibility" of staying at Wilson "if officials were prepared to provide the special education that even the school system agreed she needed." *Id*. at 68–69. In other words, the court found the student's education would have been different but for the procedural violation. *Id.* at 68 ("[A] delay does affect a student's substantive rights … if the student's education would have been different but for the procedural violation."). On the surface, *Leggett* appears to lend some support to Plaintiffs. But on a deeper read, the Court agrees with the District that "the facts in *Leggett* actually demonstrate why the [Hearing Officer's] conclusion in this case was sound." (Def.'s Mem. at 43.)[7]

Most significantly, the record here does not show that L.N.'s education "would have been different but for the procedural violation." *Leggett*, 793 F.3d at 68. For one thing, unlike in *Leggett*, where no IEP was ever completed for the student, DCPS here did develop an IEP for L.N. in June 2023 but simply neglected to share a final version with Plaintiffs before the start of

---

[7] The Court recognizes that Plaintiffs' counsel's initial August 2023 letter to the District (confirming the decision to keep L.N. enrolled at Lab) stated, "Should DCPS move forward with developing an IEP, we will cooperate with the process and consider any proposal made by the school system." (AR at 387.) But that statement does not make this case the same as *Leggett*. After all, DCPS had, in fact, "move[d] forward with developing an IEP," as Plaintiffs well knew—both in fact and in substance. And the District promptly responded to that letter to confirm as much, stressing its offer to implement the IEP at Jackson-Reed. So unlike the *Leggett* plaintiffs who were left without any meaningful response after they clearly expressed a willingness to keep the student enrolled with DCPS if they received an IEP, Plaintiffs were aware of the District's proposed IEP and with their longstanding dissatisfaction with DCPS's proposed approach.

the year. And Plaintiffs knew the contours of the District's proposal and its divergence from their preferred approach of full-time special education in a small environment like the Lab School. So, while the *Leggett* plaintiffs were essentially left in the dark, without any options other than resorting to private placement, Plaintiffs here were not. They had already objected to the proposed IEP and seemingly had no intention of removing L.N. from the Lab School to accept DCPS's proposal, which means L.N.'s education would not have been different absent the delay. *Id.* at 69; *see also D.R. v. Gov't of Dist. of Columbia*, 637 F. Supp. 2d 11, 18 (D.D.C. 2009) ("A delay does not affect substantive rights if the student's education would not have been different had there been no delay."). More, unlike the plaintiffs in *Leggett*, who pressed the District repeatedly for more information about an IEP after the initial IEP meeting, Plaintiffs here did no such thing despite being represented by experienced counsel throughout. As the Court observed already, a simple request from Plaintiffs' counsel during the back and forth in August 2023—or at any time after the June 2023 meeting—would have almost certainly cleared up any confusion around the final IEP. For at least these reasons, then, *Leggett* does not help Plaintiffs here.[8]

All told, the Court should find that the Hearing Officer rightly dismissed Plaintiffs' claim surrounding the District's untimely delivery of the June 2023 IEP because DCPS's procedural

---

[8] Plaintiffs cite other cases for this argument (Pls.' Mem. at 29–30), but only one from within our Circuit: *Alfono v. Dist. of Columbia*, 422 F. Supp. 2d 1 (D.D.C. 2006). Notably, *Alfono* found a procedural violation based on DCPS's failure to complete an IEP until several months into the school year *without discussing substantive harm*, which is somewhat understandable since that case predated some of our Circuit's clearest precedents reinforcing that procedural IDEA violations are viable only if they affect substantive rights. *See, e.g., Lesesne*, 447 F.3d at 834; *Leggett*, 793 F.3d at 67. Be that as it may, *Alfono* says nothing about the key, substantive-harm-based reason that Plaintiffs' claim fails here. More, the case is factually distinguishable because in *Alfono* the District admittedly did not *complete* an IEP—including as to "the details of how it would provide the services, … start and end dates, frequency, and goals"—before the school year, whereas here, DCPS did complete the IEP before the school year but just overlooked providing it to Plaintiffs. Beyond *Alfono*, Plaintiffs' other cases are all out-of-circuit authorities that the Court finds distinguishable and not persuasive, including for many of the reasons argued by the District. (*See* Def.'s Mem. at 41–43.)

misstep did not affect their substantive rights, whether in the form of L.N.'s educational opportunities, Plaintiffs' ability to meaningfully participate in developing the IEP, or otherwise.

### III.    Plaintiffs' Tuition-Reimbursement Request

Finally, the Court need not reach Plaintiffs' reimbursement claim for L.N.'s placement at Lab for the 2022–23 and 2023–24 school years because DCPS did not deny L.N. a FAPE during those years. *S.M.*, 2020 WL 7230266, at *7 n.3 ("Because the Court has determined that DCPS did not deny [student] a FAPE ... it does not further consider Plaintiffs' request for tuition reimbursement."); *Pinto v. Dist. of Columbia*, 69 F. Supp. 3d 275, 285 (D.D.C. 2014) (similar).

### CONCLUSION AND RECOMMENDATION

The Court can understand Plaintiffs' choice to enroll L.N. at the Lab School, where they assuredly feel she is receiving an excellent education for her needs. But the IDEA does not, it bears repeating, guarantee "the best possible education or even a 'potential-maximizing one.'" *Leggett*, 793 F.3d at 70 (quoting *Rowley*, 458 U.S. at 197 n.21). The IDEA serves as a more modest educational backstop, requiring that school districts offer "an educational program reasonably calculated to enable a child to make *progress* in light of the child's circumstances." *Endrew F.*, 580 U.S. at 403 (emphasis added). And here, the Hearing Officer reasonably concluded that DCPS's proposed IEPs in February 2022 and June 2023 IEP met that more modest obligation, despite Plaintiffs' various arguments to the contrary. So, Plaintiffs certainly remained free to place L.N. elsewhere, as they did, but that does not mean DCPS must fund that private-school placement or that the District's proposed placements fell short of the IDEA's statutory mandate.

The undersigned therefore **RECOMMENDS** that the Court **DENY** Plaintiffs' motion for summary judgment (ECF No. 8) and **GRANT** the District's motion (ECF No. 10).


Dated: July 30, 2025

$\overline{\hspace{4cm}}$
MATTHEW J. SHARBAUGH
United States Magistrate Judge

\*     \*     \*

The Court hereby advises that, pursuant to 28 U.S.C. § 636(b)(1)(C) and LCvR 72.3(b), any party who objects to a report and recommendation must file a written objection within fourteen (14) days of the party's receipt of the report and recommendation. The written objections must specifically identify the portion of the report or recommendation to which objection is made and the basis for such objections. Failure to file timely objections to the findings and recommendations set forth in this report may waive that party's right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).